Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Elaine E. Bucklo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 01 C 6135 | DATE | 5/21/2002 |
| CASE TITLE | Hoseman vs. Weinschneider, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order affirming the decision of the bankruptcy court in part and reversing in part. This case is dismissed. Any pending motion in this case is terminated as moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 7 number of notices | Document Number |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | MAY 22 2002 date docketed | 27 |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 5/21/2002 date mailed notice | |
| MPJ | courtroom deputy's initials | 02 MAY 21 PM 4:54 Date/time received in central Clerk's Office | MPJ mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DANIEL HOSEMAN, Trustee of the )
Estate of Sidney Weinscheider, )
Debtor, )
    Plaintiff, )
)
v. )
) No. 01 C 6135
SIDNEY WEINSCHNEIDER, G.W. BURTON )
& ASSOCIATES, BURTON BEHR, and )
HAROLD GEISER, )
)
    Defendants. )

## MEMORANDUM OPINION AND ORDER

DOCKETED
MAY 2 2 2002

This bankruptcy case has not been around as long as Dickens' Jarndyce and Jarndyce,[1] but it has been acquiring hoar and bulk since the initial filing in 1989. The record on appeal is four document boxes and some. Nor is this opinion likely to end the matter one way or another, alas. The case is intricate both factually and legally. At issue is whether (1) a chose in action, a state case filed after the debtor filed his petition for bankruptcy, is nonetheless part of the bankruptcy estate because it is "sufficiently rooted in the pre-bankruptcy past," and (2) the closely connected issue of whether the Trustee's lawsuit here is barred by a settlement that included a release and covenant not to sue (the "release"). On cross-motions for summary judgment, the

---

[1] See Charles Dickens, *Bleak House* 52 (Norman Page ed., Penguin Books [1853] 1971).



bankruptcy court found that the state case was part of the estate, and, after a trial, held that the affirmative defense of the release failed because the debtor fraudulently induced the Trustee to accept it, so that this action is not barred. The debtor appeals, and I reverse in part, affirm in part, and dismiss this case.

I.[2]

Sidney Weinscheider, the debtor, had been involved in nursing home management since at least 1973. In the late 1980s, he had an interest in, and considerable debts on, four nursing homes. In March 1989, Home Savings, his mortgagee, foreclosed on the mortgages of these nursing homes, and sold them in early 1989, leaving a substantial deficiency. Because of Weinschneider's experience in the field, Home Savings asked him to put together a management team to run the nursing homes. In August 1989, he met with various people to discuss the management team, among them Burton Behr, a friend of his, and Harold Geiser, a CPA and friend of Behr's. On September 25, 1989, he proposed to Home Savings that an entity called G.W. Burton ("Burton"), which would be owned by Weinscheider, Behr, and Geiser, would manage the nursing homes. Home Savings asked to meet the other members of the proposed

---

[2] This statement of facts, with one crucial addition cited specifically, is taken from the bankruptcy court's opinions in this case, *In Re Weinschneider*, Nos. 89 B 17026, 98 A 472, 2001 WL 197886 (Bankr. N.D. Ill. Feb. 27, 2001), and 1999 WL 676519 (Aug. 30, 1999).

-2-

management team. Weinschneider scheduled that meeting for October 12, 1989. On October 10, 1989, he filed a Chapter 11 petition in the bankruptcy court. Two days later, the meeting was held as agreed. On October 19, 1989, Burton was incorporated.

The arrangement about the management team was not yet finalized. During September and October 1989--crucially, nothing in the record pinpoints the date more precisely than this--Weinschneider, Behr and Geiser discussed the arrangement and agreed that Weinschneider would own 23% of Burton, and he would receive profits from that interest if Burton became the owner or lessee of the nursing homes and the homes operated at a profit. In consideration for this ownership interest, Weinschneider would continue: (1) his efforts to bring Burton an opportunity to enter into a management agreement and purchase option with Home Savings, and (2) to advise Behr and Geiser regarding how to manage the nursing homes. Def. Ex. 1 at 6. On November 15, 1989, Weinschneider filed his "Statement of Financial Affairs, Schedules of Assets and Liabilities, Statement of Executory Contracts" with the bankruptcy court. That statement did not disclose any claims against or contracts with Burton, Behr or Geiser. Weinschneider continued his efforts to put together a management agreement, and on December 1, 1989, he succeeded in obtaining a management contract with Home Savings, Behr, and Geiser for Burton. On February 12, 1990, Burton took over management of the nursing homes. In October 1991, Burton

bought one of the homes, which it later operated at a profit. So far, Burton has not paid Weinschneider anything.

Meanwhile, in May 1990, Weinschneider's Chapter 11 case was converted to a Chapter 7 case. Daniel Hoseman was appointed as the Trustee. In June 1990, the Official Unsecured Creditors Committee filed an adversary action ("the 1990 litigation") against Weinschneider and others seeking, among other things, a turnover of certain property. The Trustee settled the 1990 litigation in 1992, and, in December 1996, executed pursuant to that settlement a broad release. The release stated that the Trustee would refrain from "instituting, prosecuting, or participating in any suit or action, at law or in equity, or to take any action to collect, enforce, or recover on any claim, known or unknown, which the [bankruptcy estate] could have against [Weinschneider, his wife, and certain trusts]."

In June 1995, Weinschneider filed an amendment to his bankruptcy schedule B-3 to indicate that he held a 23% interest in Burton. The amendment stated:

> Debtor amends Schedule B-3 to list a post-petition acquired claim that is not property of the bankruptcy estate. This Amendment is made for disclosure purposes only and does not make this claim property of the bankruptcy estate. The post-petition claim is as follows:
>
> Claim for a 23% interest in G.W. Burton and Associates, L.T.D. ("G.W. Burton") based on an agreement made between debtor, Burton W. Behr and Harold Geiser . . . . The debtor's claim for this interest is not property of the estate because the interest was acquired after the 10/10/89 bankruptcy filing and the debtor did not have any sort of claim for such interest as

-4-

of the bankruptcy filing. Such claim cannot be characterized as proceeds or other progeny of property of the bankruptcy estate under code sec. 541(a)(6). Likewise, the interest in G.W. Burton was given to Sidney Weinschneider in exchange for his post-petition services to G.W. Burton. The value of this claim is listed as unknown because it is highly speculative. Debtor has made several demands to formally obtain the interest in G.W. Burton. It appears that a lawsuit may have to be filed in order to enforce the above described agreement and acknowledgement.

A letter sent to the Trustee, dated June 15, 1995, in connection with this amendment, did not indicate that Weinschneider had laid the groundwork for the management contract or even had begun negotiations for an interest in Burton before filing his Chapter 11 petition.

In February 1996, Weinschneider filed a state contract action against Burton, Behr and Geiser seeking his share of Burton's profits. On February 27, 1998, the Trustee sued in bankruptcy court seeking a declaration that the state court law suit was the property of the bankruptcy estate. Weinschneider argued that the Trustee's suit was barred by the release. Both parties filed for summary judgment. On August 30, 1999, the bankruptcy court granted summary judgment to the Trustee on his claim that the state court suit is the property of the bankruptcy estate and denied both parties' motions for summary judgment on Weinschneider's affirmative defense. After trial, on February 27, 2001, the bankruptcy court ruled that the Trustee's action was not barred by the release because there was evidence that Weinschneider fraudulently induced the release by making false statements in his

amended B-3, and so the release was void. This appeal followed.

II.

Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). When reviewing the bankruptcy's court's decision to grant summary judgment, I consider all facts in the light most favorable to the party opposing the motion (here Weinschneider) and resolve all inferences in his favor. *Simpson v. Borg-Warner Auto., Inc.*, 196 F.3d 873, 876 (7th Cir. 1999). I review the bankruptcy court's factual findings for clear error, and I review its conclusions of law de novo. *In Matter of Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996). If the bankruptcy judge correctly states the law, then "his findings as to whether the facts meet the legal standard will be disturbed only if they are clearly erroneous." *Johnson v. West*, 218 F.3d 725, 729 (7th Cir. 2000). Although I give "mixed findings of facts and law deferential review," *Pilditch v. Board of Educ. of City of Chicago*, 3 F.3d 1113, 1115 (7th Cir. 1993), my review is "more searching if the [bankruptcy] court has committed an error of law, including one that 'infect[s] a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law.'" *Johnson*, 218 F.3d at 729 (citations omitted); *In re Ebbler Furniture and Appliances, Inc.*, 804 F.2d 87,

89 (7th Cir. 1986) (bankruptcy context) ("[F]actual determinations are subject to the clearly erroneous standard; but the manner in which these factual conclusions implicate [] legal [conceptions] is subject to a de novo review.").

III.

I begin with the bankruptcy court's determination that there was no material issue of fact as to whether the state court lawsuit is properly part of the bankruptcy estate because it was "sufficiently rooted in the pre-bankruptcy past." Section 541 of the Bankruptcy Code broadly defines the bankrupt's estate as including "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). However, the Supreme Court has held that a claim that "is sufficiently rooted in the pre-bankruptcy past . . . should be regarded as 'property' [for bankruptcy purposes]." *Segal v. Rochelle*, 382 U.S. 375, 380 (1966) (tax refund context).[3] The scope of *Segal* is "generous." 382 U.S. at 379 (pointing out that the thrust of what is now § 541 is "to secure for creditors everything of value the bankrupt may possess . . . when he files his petition."). The Seventh Circuit has said that "every conceivable

---

[3] *Segal* interpreted the Bankruptcy Act rather than the current Code, but the Seventh Circuit has said that "the legislative history specifies that its holding is applicable under the Code." *In the Matter of Yonikus*, 996 F.2d 866, 869 (7th Cir. 1993) (citing S. Rep. No. 989, 95th Cong., 2d Sess. 82, reprinted in 1978 U.S.C.C.A.N. 5787, 5868; H.R. Rep. No. 595, 95th Cong., 2d Sess. 367, reprinted in 1978 U.S.C.C.A.N. 5963, 6323).

-7-

interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of § 541," *In the Matter of Yonikus,* 996 F.2d 866, 869 (7th Cir. 1993) (citing *In re Neuton,* 922 F.2d 1379, 1382-83 (9th Cir. 1990)), as long as the interest is actual, *see Segal* 382 U.S. at 379 ("[I]n order to fall within [what is now § 541's] mandate, the debtor's 'property' must have been in "alienable or leviable form when he file[d] his petition."). The debtor must actually have had some sort of pre-petition rights to the property in question in order to trigger the *Segal* "sufficiently rooted" rule. *See, e.g., Field v. Transcontinental Ins. Co.,* 219 B.R. 115, 119 (E.D. Va. 1998), *aff'd* 173 F.3d 424 (4th Cir. 1999) (Debtor had a "contingent right" of coverage.). Claims arising from contracts into which the debtor had entered before filing his bankruptcy petition have been held to be within the reach of § 541. "Among the debtor's legal interests that become a part of the bankruptcy estate under the Code are his choses in action and claims against third parties as of the commencement of the case. These choses in action and claims clearly include rights of action based upon contract." *In re Ryerson,* 739 F.2d 1423, 1425 (9th Cir. 1984).

In the present case, the bankruptcy court reasoned that the "deal with Burton was a continuation of Weinschneider's pre-bankruptcy business," and so "the state court suit [was] significantly related to Weinschneider's pre-bankruptcy activities,

*i.e.*, the matters giving rise to the state court suit are rooted in [his] pre-bankruptcy past." *In Re Weinschneider*, No. 89 B 17026, 98 A 472, 1999 WL 676519, at *11 (Bankr. N.D. Ill. Aug. 30 1999). However, contrary to the Trustee's suggestion, the bankruptcy court did not hold that the contract was formed before the petition was filed, but only that Weinschneider participated in negotiations leading to its formation before the filing:

> During the discussions which took place during September and October 1989, Weinschneider and the Defendants agreed that Weinschneider would own 23% of G.W. Burton and would receive a portion of G.W. Burton's profits; that Weinschneider would continue his efforts on behalf of G.W. Burton to enter into a management agreement with Home Savings; and that Weinschneider would receive profit distributions from his ownership interest in G.W. Burton only if G.W. Burton should become the owner or lessee of the nursing homes and should the nursing homes operate at a profit.

*Id.* at *4. The statement in Weinschneider's Second Verified Amended Complaint in his state court case from which this summary is derived says only that "during September and October 1989," he participated in several meetings, and agreed to take an interest in Burton in exchange for certain services. Def. Ex. 1 ¶¶ 21-22 at 6. It does not say that agreement was reached before Weinschneider filed for bankruptcy on October 10, 1989. I cannot find anything in the record that would indicate that it was. The evidence is only that it was formed some time during September or October of 1989. It might have been formed after October 10.

Because on summary judgment, the facts must be read in the light most favorable to, and all reasonable inference drawn in

-9-

favor of, the party opposing the motion, I must assume that the agreement was reached after the filing. Weinschneider himself so testifies, *see* Response to Summary Judgment Motion, Def. Ex. 2, at 25 (Weinschneider's testimony); and he offers in support Behr's testimony, *see* Ex. 3, at 246 (believed that there was no binding contract as of October 12, 1989), and Geiser's testimony, Ex. 4, at 9-11 (before October 10, 1989, only an "agreement to agree"). The Trustee points out that Behr's testimony might be read as inconsistent, *see* Plaintiff's Answer to Statement of Additional Uncontested Facts ("Answer") at 4, Pl. Ex. A, at 248 (Behr saw himself as a "partner" with Weinschneider before the filing). However, reading the facts in the light most favorable to Weinschneider, I conclude that for purposes of the motion, Behr did not understand "partnership" to imply a contract. At the very least the inconsistency creates a material issue of fact. The Trustee also denied that Geiser's testimony, in context, says what Weinschneider claimed it says or that it supports the conclusion for which it is offered, Answer at 5, but Geiser's testimony can be construed in the way that Weinschneider suggests, and for summary judgment purposes, must be so construed. Therefore, for summary judgment purposes, I find that the contract was formed after Weinschneider's filing.

In any event, the bankruptcy court did not use the rule in *Ryerson*, instead applying the *Segal* "rooted in the pre-bankruptcy

past" doctrine directly without consideration of whether there was a contract. The court reasoned that the debtor "continued his business dealings and operations as if he had not filed a . . . petition." 1999 WL 676519, at *11. But that is not the inquiry. *Segal* is an "expansive" and "generous" rule, but it requires that "to fall within [§ 541's] mandate, the debtor's 'property' must have been in "alienable or leviable form when he file[d] his petition." *See Segal*, 382 U.S. at 379. Thus, in a contract case, there must have been a contract, something that could have been enforced, and assigned or otherwise alienated or levied against. *See, e.g., Brunswick Leasing Corp. v. Wisconsin Cent., Ltd.*, 136 F.3d 521, 530 (7th Cir. 1998) (*citing Kohlmeier v. Shelter Ins. Co.*, 525 N.E. 2d 94, 101 (Ill. App. Ct. 1988)) ("In Illinois, generally only a party to the contract or one in privity to a party may sue to enforce it."); *Gibson v. Neighborhood Health Clinics, Inc.*, 121 F.3d 1126, 1130 (7th Cir. 1997) (No mandatory arbitration without a contract). Mere negotiations, however artfully conducted, won't suffice to create a right to alienable or leviable property, including a right to sue. *See Quake Const., Inc. v. American Airlines, Inc.*, 565 N.E. 2d 990, 1006 (Ill. 1990) (citing 1 S. Williston, *A Treatise on the Law of Contracts* §§ 26 through 28 (3d ed. 1957)) (Stamos, J., concurring); *Anand v. Marple*, 522 N.E. 2d 281, 282 (Ill. App. Ct. 1988) (distinguishing "valid, enforceable contract" from "merely preliminary negotiation"). Neither will

merely carrying on one's normal business activities as if one were not going to declare bankruptcy or had not declared bankruptcy create a pre-petition right to any property.

Without a contract, there would be no prospect of any interest in a breach of contract case that had to be disclosed, and without the claim that there was a contract to breach, there would be no state court action to roll into the bankruptcy estate. Without the contract, whether it was pre-petition or post-petition, the negotiations on which the bankruptcy court bases its conclusions would by themselves have no legal effect or relevance. The pre-petition existence of the contract was crucial, and *Ryerson* is the main case on when obligations and rights that arise under a contract come under § 541 via *Segal*. Accord *In re Taronji*, 174 B.R. 964, 971 (Bankr. N.D. Ill. 1994) (Wedoff, J.) ("The approach of . . . *Ryerson* provides the proper rule for decision . . . ."); *In re Allen*, 226 B.R. 857, 863 (Bankr. N.D. Ill. 1998) (Schmetterer, J.) (citing cases).

*Ryerson* held that the termination payments due under a pre-petition contract were part of the bankruptcy estate, even though paid after commencement of the case, "at least to the extent the payments are related to pre-bankruptcy services," 739 F.2d at 1425; and "any portion of the [proceeds] related to services performed after [the date of the debtor's filing] are not includable with the bankruptcy estate." *Id.* at 1426. Therefore, for summary judgment

purposes, before Weinschneider filed his petition, and until the contract was formed, he had no right to sue for a share of Burton that might have rolled into the bankruptcy estate.

Moreover, the undisputed facts, viewed most favorably to Weinschneider, would not support the idea that Weinschneider's state court case concerns payment for pre-petition services that, under *Ryerson*, would be part of the bankruptcy estate, rather than for post-petition services that would not be part of the estate. The plain terms of the purported contract, as the Verified Second Amended Complaint clearly says, were for *continued* provision of the services in question, so only services subsequent to its formation would count as consideration.[4] The services included (1) continued efforts to bring Burton the opportunity to enter into a management agreement and a purchase option with Home Savings, and (2) continued advice to Behr and Geiser on nursing home management. There is indeed evidence from which a finder of fact might conclude that Weinschneider had been working hard before his filing for bankruptcy at least to secure a management agreement, notably, the speed with which matters concluded post-bankruptcy, 1999 WL 676519, at *11, the agreement being concluded on December 1, 1989. But I can find no evidence that any of this pre-filing work was done

---

[4] In any event, services that were pre-petition but pre-contract services would be past consideration and would not normally support a common law contract. *Gladstone v. McHenry Medical Group*, 553 N.E. 2d 1174, 1180 (Ill. App. Ct. 1990).

-13-

after the purported contract was formed, nor indeed any evidence that the contract was concluded pre-petition. Therefore, applying the rule in *Ryerson*, the state court case does not concern any property or interest of Weinschneider's that should be treated as part of the bankruptcy estate because it is "sufficiently rooted in the pre-bankruptcy past." The bankruptcy court's grant of summary judgment on this issue is therefore reversed.

IV.

After a trial, the bankruptcy court rejected Weinschneider's affirmative defense that the release entered into as part of the settlement of the 1990 litigation barred this lawsuit. The Trustee argues that the release did not bar this action because it is not an action against Weinschneider personally but is an *in rem* proceeding related to the property of the estate. The bankruptcy judge rejected this argument, holding that the Trustee's complaint would affect Weinschneider's rights *vis a vis* the state court suit, 1999 WL 676519, at *11, and I agree. The Trustee cites *Chandler Bank of Lyons v. Ray*, 804 F.2d 577 (10th Cir. 1986), which, however, does not involve a release or § 541, but concerns a lien and § 524. That case holds that discharge in bankruptcy "will not prevent enforcement of valid liens." *Id.* at 579. That is not the issue here. The bankruptcy court is affirmed on this point.

The bankruptcy court found that the release was fraudulently induced. The Illinois Supreme Court has formulated the elements in

-14-

a fraudulent misrepresentation as: (1) a false statement of material fact, (2) knowledge or belief of the falsity by the party making it, (3) intention to induce the other party to act, (4) action by the other party in reliance on the truth of the statements, and (5) damage to the other party resulting from such reliance. *Board of Educ. of City of Chicago v. A, C and S, Inc.*, 546 N.E. 2d 580, 591 (Ill. 1989).

As noted, the bankruptcy court, referring to its disposition of the cross-motions for summary judgment, held that the state court suit was "rooted in Weinschneider's pre-bankruptcy past," *In Re Weinschneider*, Nos. 89 B 17026, 98 A 472, 2001 WL 197886 (Bankr. N.D. Ill. Feb. 27, 2001), at *3, and, first, "[t]herefore [Weinschneider's] statement in his amended B-3 that the claim was acquired post-petition, and that his interest in G.W. Burton was given to him in exchange for his post-petition services is a false statement of material fact," *id.*[5] However, the undisputed evidence, drawn here crucially from the relevant paragraphs of the second amended verified complaint, will not support the claim that Weinschneider's state court case was sufficiently rooted in its pre-petition past. For purposes of summary judgment, no pre-

---

[5] It does not follow, even if Weinscheider had a pre-petition interest in a subsequent state court lawsuit concerning Burton, that he therefore had a pre-petition interest in Burton itself. The lawsuit would not give him an enforceable claim to that interest. He might lose, in which case it would be adjudicated that he had no interest based on any such contract.

-15-

petition contract existed and no pre-petition but post-contract services were provided. Therefore, Weinschneider made no false statement of material fact, and knew about no such false statement. The Trustee, accordingly, cannot make out a fraudulent misrepresentation theory to defeat Weinschneider's affirmative defense of the release.

Second, the bankruptcy court concluded that Weinschneider "knew or believed the statements [at issue] to be false." 2001 WL 197886, at *3. In particular, the court noted that pre-petition meetings about assembling a management team for Burton took place and that Weinschneider participated in at least one of them. *Id*. However, as explained, this does not support the idea that the claim was acquired pre-petition, which would require, rather, that the contract was formed before the filing; and, moreover it does not support the idea that any services were rendered pre-petition pursuant to the contract. Therefore, the undisputed evidence on which the court relied will not support the conclusion that Weinschneider lied or failed to disclose what he should have done.

Indeed, even if the bankruptcy court were correct as a matter of law in holding that the state court lawsuit at issue here was sufficiently rooted in the pre-bankruptcy past, I do not think that the evidence would support the inference that Weinscheider lied. A lie would require that he knew that the property was acquired pre-petition, and concealed the fact. But even if Weinschneider

-16-

might have acquired a contractually enforceable right to a share of Burton without a contract, this is not obvious. His rights in this matter depend on a rather subtle issue of law, the construction of § 541 and its predecessors in a Supreme Court case, *Segal*, and the cases in that line. This is a matter about which experienced bankruptcy lawyers and judges can be unclear, much less a layman like Weinschneider. *See* Weinschneider Discovery Deposition, Pl. Ex. 7, at 165-66 (He would consult an attorney on a legal matter). Regardless of the subtlety of the legal issues, whether he had any pre-petition property right depended on an issue of law. With respect to the bare factual narrative, who did what when and how, Weinschneider does not appear to have misled anyone or concealed anything relevant or done anything from which an intention to mislead might be inferred.

Dirk Andringa, the Winston & Strawn attorney who prepared the amended statement, asked Weinschneider about conversations with Behr or Geiser before October 10, 1989, and testified that Weinschneider told him that there was no pre-petition agreement for a partnership share, Trial Transcript ("Trial Tr."), Apr. 14, 2000, at 128, but that Weinschneider may have had "discussions" with Behr and Geiser about the management agreement before that date. *Id.* at 129. That is, Weinschneider told his lawyer pretty much what he averred in his Second Amended Verified Complaint. On that basis, Andringa concluded that there was no pre-petition interest to

declare, and advised Weinschneider to say so in his Amended B-3.

Even if Andringa was wrong, what makes that a lie on Weinschneider's part? As far as the evidence in the record shows, he answered the questions put to him accurately at least with respect to the facts. He did not conceal the pre-petition meetings and negotiations with Behr and Geiser. If Weinschneider should have said something more, and if that something more should have showed that in light of *Segal* there was a pre-petition interest in the property, then at worst Weinschneider might have committed negligent misrepresentation. See *Stewart v. Thrasher,* 610 N.E. 2d 799, 802 (Ill. App. Ct. 1993)("A negligent misrepresentation is a representation the maker believes to be true, but is, in fact, false."). Fraudulent misrepresentation involves "the making of a representation which the maker *knows* to be false, or is made with reckless disregard for its truth or falsity." *Id.* Here he could not have known that the statement was false, if it was false, unless he knew the law, and there is no evidence that he did; his lawyer did not so advise him, presumably because he did not think that was the law. So, on the evidence in the record, Weinschneider cannot be attributed an intention to make a false statement of material fact. To put it another way, the falsity the bankruptcy court found was in the legal characterization, not the factual narrative.[6] That is,

---

[6] Strictly this would apply to evidence not only about the rather subtle and arcane issue at question here, but also, e.g., to whether a contract existed. But evidence can be offered to whether

-18-

the bankruptcy court concluded that Weinschneider lied not about the facts, but about the legal characterization of those facts. However, "a statement of a conclusion of law cannot form the basis of a claim of misrepresentation." *McComb v. Seestadt,* 417 N.E. 2d 705, 709 (Ill. App. Ct. 1981). In this case, moreover, Weinschneider and his attorneys were right about the law.

The Trustee, therefore, has failed to make out the elements of fraudulent misrepresentation. The release, therefore, stands, and the Trustee is barred by its terms from pursuing this action.

V.

The decision of the bankruptcy court is REVERSED IN PART and AFFIRMED IN PART, and this case is DISMISSED.

**ENTER ORDER:**

*/s/ Elaine E. Bucklo*
**Elaine E. Bucklo**
United States District Judge

Dated: May 21, 2002

---

the purported parties *thought* a contract existed--that would relevant to whether any misrepresentation was intentional; it might also be offered to show that the factual predicates of contract formation, such as agreement on terms or consideration, were or were not satisfied.

-19-